## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

BARBARA LYNN HAZLETT, as
substitute party for BEN A. HAZLETT,
deceased,

                Plaintiff,

vs.                              Case No. 09-CV-292-FHM

MICHAEL J. ASTRUE,
Commissioner, Social Security
Administration,

                Defendant.

## OPINION AND ORDER

Plaintiff, Barbara Lynn Hazlett, as substitute party for Social Security claimant Ben
A. Hazlett, deceased, seeks judicial review of a decision of the Commissioner of the Social
Security Administration denying Social Security disability benefits.[1]  In accordance with 28
U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States
Magistrate Judge.

## Standard of Review

The role of the court in reviewing the decision of the Commissioner under 42 U.S.C.
§ 405(g) is limited to a determination whether the record as a whole contains substantial
evidence to support the decision and whether the correct legal standards were applied.
*See Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1237 (10th Cir. 2001); *Winfrey v.
Chater*, 92 F.3d 1017 (10th Cir. 1996); *Castellano v. Secretary of Health & Human Servs.,*

---

[1] Claimant's December 15, 2004, application for disability benefits was denied initially and on
reconsideration.  A hearing before Administrative Law Judge ("ALJ") John Volz was held May 15, 2007.  By
decision dated May 22, 2007, the ALJ entered the findings that are the subject of this appeal.  The Appeals
Council denied Plaintiff's request for review on March 23, 2009.  The decision of the Appeals Council
represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

26 F.3d 1027, 1028 (10th Cir. 1994).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner.  *Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991).  Even if the court would have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands.  *Hamilton v. Secretary of Health & Human Servs.,* 961 F.2d 1495 (10th Cir. 1992).

## Background

The claimant was deceased at the time of the hearing.  The action before the agency and before this court is being prosecuted by the claimant's widow.  The claimant had a college education and formerly worked as a school principal.  He claimed onset of disability on December 31, 2000, due to arthritis in his left wrist and shoulder, an inability to lift or stand, and status post prostatectomy. [R. 103-4, 127].

The ALJ determined that from the claimed date of onset, December 31, 2000, to the date of his death, March 19, 2005, the claimant had the residual functional capacity for light work, which capacity did not preclude performance of past relevant work as a school principal as that job was actually performed and as it is generally performed.  In addition, based on the testimony of a vocational expert, the ALJ found that there are a significant number of other jobs in the national economy that the claimant could have performed.  The case was thus decided at step four of the five-step evaluative sequence for determining

whether a claimant is disabled, with an alternative step five finding.  *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

### Plaintiff's Allegations

Plaintiff asserts that the ALJ's residual functional capacity (RFC) determination is not supported by substantial evidence; that the ALJ failed to properly consider the credibility of claimant, or his wife; and the ALJ failed to properly question the vocational expert. Plaintiff's arguments are without merit.  The Court concludes that the record contains substantial evidence supporting the ALJ's denial of benefits in this case, and that the ALJ applied the correct standards in evaluating the evidence.  Therefore the Commissioner's denial of benefits is AFFIRMED.

### Residual Functional Capacity Determination

Plaintiff's claim that "[t]he ALJ did not address the facts of the medical evidence demonstrating that the Plaintiff had been extremely ill as the result of his condition," [Dkt. 16, p. 5], is without merit.  The medical record does not contain the statement Plaintiff attributed to the claimant's treating physician, Dr. Willison that  "Mr. Hazlett had been feeling quite ill."  *Id.* at p. 2.  What Dr. Willison reported in January 2003 is: "In speaking with the patient, he has been feeling quite <u>well</u>." [R. 190](emphasis supplied).

The ALJ's summary of the medical evidence was brief, but accurate.  The ALJ stated:

> Mr. Hazlett's prostate surgery in April 2001 was followed by years of monitoring.  In a progress note dated October 15, 2003, radiation oncologist Fred Willison, M.D. reported that Mr. Hazlett told him he was feeling well and had no complaints (Exhibit 4F, p.2).  The impression of John B. Forrest, M.D. on November 3, 2004 was that Mr. Hazlett showed no evidence

of a recurrence of his prostate cancer.  His PSA had been "0" since his radical prostatectomy. He exercised regularly and his weight and appetite were stable. (Exhibit 5F, p. 1).

The claimant's cause of death appeared in the Report of Autopsy from the Oklahoma Office of the Chief Medical Examiner.  Mr. Hazlett was said to have died from cardiac tamponade due to aortic dissection (Exhibit 8F, p. 3).

Upon review of the evidence, the Administrative Law Judge finds that the claimant appears to have made a near if not complete recovery from his prostatectomy.  He had retired three years earlier from his longstanding career as a school administrator.  Except for a brief stint as a private school tutor in 2002, he does not appear to have sought new employment after his retirement at any time prior to his demise in March 2005.  By his medical reports, Mr. Hazlett was in good health after his prostatectomy and he exercised routinely.  His passing from a cardiac dysfunction was not preceded by noticeable symptoms and his activities of daily living do not seem to have been limited in any significant way.  In a pain questionnaire he completed less than a month before his death, Mr. Hazlett wrote of pain in his wrists, knees, and shoulder.  He alleged that the pain kept him from running or lifting.  But he also wrote that he alternated walking and swimming for exercise and that he did minor household chores (Exhibit 5E).

[R. 27].  The record more expansively summarized as follows does not contradict the ALJ's decision.

The claimant claimed disability beginning December 31, 2000, which is also the date he retired as a school principal.  Claimant had hernia repair surgery in 1998, before the alleged onset date. [R. 176].  The earliest progress notes by claimant's treating physician, Dr. Gebetsberger were dated before claimant's retirement.  On September 14, 2000, Dr. Gebetsberger stated that claimant had an elevated PSA in June when he attended a health fair.  The only urinary symptom was a slight decrease in stream and occasional nocturia (1 time) and no dribbling or trouble getting his stream started. [R. 161].  On February 7,

2001, Dr. Gebetsberger recorded that claimant was asymptomatic urologically, does not get up at night to void, and voids every 3-4 hours during the day. [R. 230].

Claimant had prostate surgery (bilateral pelvic lymphadenectomy, radical retropubic prostatectomy) on April 23, 2001. [R. 209].  On May 29, 2001, five weeks post-op, Dr. John B. Forrest, M.D. of Urologic Specialists of Oklahoma recorded that claimant has some urinary stress incontinence and no nocturnal enuresis. [R. 203].  On July 29, 2001, Dr. Forrest recorded claimant's urinary control is basically normal. [R. 202].  That observation was repeated on August 23, 2001. [R. 201].  Dr. Gebetsberger performed an annual exam on November 16, 2001, and recorded that claimant is "still having urinary problems but this is secondary to his prostatectomy." [R. 157].  On that same date Dr. Gebetsberger also recorded "he has good bladder control now.  Erectile problems persist." *Id.*  Seven months post op, on November 26, 2001, Dr. Forrest noted "urinary control is basically normal," that claimant was exercising 6 days a week, either running or swimming, and the only concern expressed was erectile dysfunction. [R. 200].  The records of Dr. Forrest continued to document normal urinary control on May 13, 2002 and November 5, 2002. [R. 197-98].

On December 12, 2002, Dr. Gebetsberger performed an annual physical and in a review of systems he recorded there were no complaints of unusual weakness, claimant denied dyspnea, complained of urinary dribbling, but denied arthralgia, joint stiffness, or myalgia. [R. 154].  On examination Dr. Gebetsberger found claimant's joints were normal except for a scar over the left shoulder, but "ROM is OK." *Id.*

A consult note dated January 13, 2003, by radiation oncologist, Frederick Willison, M.D. stated claimant was feeling quite well with very minimal stress urinary incontinence. [R. 190].  Radiation therapy was begun in January 2004 due to a rising PSA, which is

5

indicative of a recurrence of prostate cancer. [R. 192].  Claimant received radiation from January 27, 2003, to March 14, 2003, for 35 treatments in 46 days. [R. 189].  During the treatments, on most visits claimant reported no urinary or bowel problems. [R. 186-88].  On an April 16, 2003, follow-up examination Dr. Willison recorded that claimant had no ongoing side effects related to the radiation and that claimant denied bowel or bladder problems. [R. 183].  Claimant reported to Dr. Willison on May 15, 2003, that toward the end of the radiation therapy he had minor bowel discomfort, but it resolved.  Further, he denied dysuria, frequency, urgency, or urinary incontinence. [R. 196].  On October 7, 2003, Dr. Forrest examined claimant and recorded that he had normal urinary control and that he was exercising. [R. 195].  On October 15, 2003, Dr. Willison recorded, "Today Ben is feeling well and has no complaints.  He denies urinary symptoms or rectal problems.  Overall he feels quite well." [R. 182].

Claimant had an initial visit with John E. Hubner, M.D. on December 30, 2003. There was no mention of urinary problems, fatigue, or inability to use the left hand or shoulder. [R. 268].  On April 13, 2004, and on November 3, 2004, Dr. Forrest recorded that claimant reported that his urinary control was normal. [R. 193, 194].  On December 13, 2004, claimant returned to Dr. Hubner for an annual physical.  Dr. Hubner recorded that claimant remains very active.  He had some issues of arthralgia in his left wrist and shoulder, and that osteoarthritis would receive symptomatic care. [R. 251].  There was no mention in Dr. Hubner's records of excessive fatigue or shortness of breath.

On March 19, 2005, Plaintiff became unresponsive while swimming at the health club and was transported to the hospital.  He could not be revived and died shortly after his arrival at the hospital. [R. 282, 292].

The Court finds that nothing in the record contradicts the ALJ's RFC finding.

Plaintiff contends that the ALJ made comments at the hearing concerning the possibility of granting a closed period of disability which mislead Plaintiff's representative and served to chill further argument on Plaintiff's behalf.  The record does not support Plaintiff's contention.

At the hearing Plaintiff, claimant's wife, testified that claimant was weak, fatigued and worn out. [R. 321].  The ALJ remarked that radiation treatment for cancer could cause fatigue and questioned the length of time the claimant received radiation treatment.  *Id.*  Plaintiff responded that the treatment lasted 7 weeks, but the fatigue preceded the treatment.  *Id.*  The ALJ asked Plaintiff's representative his theory of the case and the following statements were made:

> ALJ:   [F]rankly I'm thinking in terms of, of a closed period during the cancer treatment now.  I'm not bound.  I'm not wed to that but –
>
> REP.   I certainly wouldn't have an objection to that, Your Honor, and I've discussed the issues with my Client and the fact that we don't have anything in the records giving us an RFC of any sort.  We know he had problems but we just don't know the limitations from those problems.  And I discussed that with my Client.  He did complain of problems with the dominant hand, left hand as far as Arthritis, Arthralgias, and that can be found in a couple of exhibits.  All we had to rely on obviously is going to be the testimony of that hand.  <u>We don't have anything in the record of, to say this is the limitations he had with his hand</u>.  And so I'm kind of in a rock and a hard spot presenting that as well.  But, if the option of a closed period is there, you know, we certainly would not have an objection to looking at that option.

[R. 322] (emphasis supplied).  After obtaining testimony about the timing of claimant's surgery and his exercise regimen, the ALJ made the following comment to the Plaintiff's representative:

7

> ALJ.  Mr. Owen, I'll, I'll be happy to listen to some arguments from you if you want to bring out something with your client that's, that's more.  But I'm having a problem because he's a man who's swimming, continues to swim twice a week.  And was sedentary before that, I mean, he was sedentary work.  There wasn't any argument you, you can make for, even for a closed period to be honest with you.

[R. 324-25].  Later, the ALJ reiterated :

> Well, what I have to determine is what his restrictions were and I don't, I don't see any yet frankly.  I mean, I would certainly feel that while he was undergoing radiation he, he had, like, if he had fatigue, I can give him that.  I don't, I don't, I don't see anything about Marfan's other than the mention of it at autopsy really.

[R. 327].  Thus, when the ALJ's comments are not viewed in isolation as presented in Plaintiff's brief, it is apparent that the comments were not misleading, or chilling.  In fact, the comments made by the Plaintiff's representative as quoted above demonstrate that, the ALJ's comments did not foster confusion or chill argument.   Rather, Plaintiff's representative and the ALJ both acknowledged the record lacked evidence of limitations.

The Court rejects Plaintiff's assertion that the ALJ erred by failing to address Marfan's syndrome in the decision or that based on the suggestion contained in the autopsy that claimant's body habitus contained features "possibly consistent with Marfan's syndrom (mild scoliosis, tall stature, long toes)," the ALJ was required to launch a "longitudinal review of the case," [Dkt. 16, p. 6] [R. 288].  The record does not support Plaintiff's assertion that the ALJ stated at the hearing that "*he knew that Marfan's can cause fatigue*," [Dkt. 16, p. 7] (emphasis in Plaintiff's brief).  Plaintiff misquoted the ALJ's statement and based her argument on that misquote.  The following is contained in Plaintiff's brief:

> ALJ:   *Well I know but that is the problem all we have is the finding at autopsy and we have no opinions about whether Marfan's caused that.  **It can cause fatigue.***

[Dkt. 16, p. 7]  (emphasis in Plaintiff's brief).  What the ALJ actually said at the hearing follows:

> ALJ:   Well, what I have to determine is what the man's, what his restrictions were and I don't, I don't see any yet frankly.  I mean, I would certainly feel that while he was undergoing radiation he, he had, like, if he had fatigue, I can give him that.  I don't, I don't, I don't see anything about Marfan's other than the mention of it at autopsy really.
>
> CLMT: The doctor never mentioned it to him.
>
> ALJ:   Well, I know, but, but, that's the problem.  All we have is a finding at autopsy that – and we have no opinions about what, what, what the, what Morfan's [sic] can cause that; can cause fatigue.

[R. 327-28].  Rather than making a statement that Marfan's syndrome can cause fatigue, the ALJ commented that the record contains no opinions that it can.  The Court finds no error in the ALJ's treatment of the autopsy suggestion that Plaintiff may have had Marfan's syndrome.[2]

### Credibility Analysis

Plaintiff asserts that the ALJ failed to perform a proper credibility analysis: "This ALJ made no finding regarding credibility anandi ot [sic] resolve the inconsistencies in his decision with the testimony and MER in file.  That alone is error." [Dkt. 16, p. 9] (emphasis omitted).

---

[2] Counsel for Plaintiff is admonished that Fed. R. Civ. P. 11(b)(3) is applicable to representations of the record in Social Security disability appeals.  Beyond Rule 11 responsibilities, inaccurate factual representations do not serve the client in that such representations detract from the presentation of possibly meritorious arguments.

The Commissioner is entitled to examine the medical record and to evaluate a claimant's credibility in determining whether the claimant suffers from disabling pain. *Brown v. Bowen*, 801 F.2d 361, 363 (10th Cir. 1986).  Credibility determinations made by an ALJ are generally treated as binding upon review.  *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990).  In evaluating an claimant's complaints, the ALJ must consider factors such as the levels of medication taken by claimant and their effectiveness, the extensiveness of claimant's attempts (medical or nonmedical) to obtain relief, the frequency of claimant's medical contacts, the nature of daily activities, subjective measures of credibility, and the consistency or compatibility of claimant's testimony with the objective medical evidence.  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).

The ALJ's credibility analysis could have been more detailed.  It is clear, however, that the ALJ credited the medical record's reports of good health and claimant's own description of his activities of daily living over testimony to the contrary.  The ALJ cited to the pain questionnaire claimant in his own handwriting completed less than a month before he died and accurately summarized the claimant's description of his activities. [R. 27, 103-04].   The ALJ's conclusion that neither the medical record, nor the claimant's own description of his activities demonstrated an inability to work is supported by substantial evidence.

## Questioning of the Vocational Expert

Plaintiff claims that the hypothetical question posed to the vocational expert was incomplete in that it failed to include limitations related to prostate cancer and related surgery, hernia repair surgery times three, weeks of radiation, previous left shoulder surgery with screw placement, dominant left wrist surgery, or heart problems. [Dkt. 16, p.

10]. In *Hargis v. Sullivan,* 945 F.2d 1482, 1492 (10th Cir. 1991) the Court stated that "testimony elicited by hypothetical questions that do not relate with precision all the claimants' impairments cannot constitute substantial evidence to support the Secretary's decision." However, in posing a hypothetical question, an ALJ need only set forth those physical and mental impairments which are accepted as true by the ALJ. See *Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990).

As previously discussed, the record does not support limitations related to the prostate cancer, surgery, or radiation therapy. Moreover, the last hernia repair was performed in February 1998, nearly 3 years before the alleged onset of disability. There are no records directly related to the wrist and shoulder surgeries, but the history and physical related to the hernia repair records that the claimant had wrist surgery in 1968 and shoulder surgery in 1980. [R. 176]. Claimant stated he could lift about 20 pounds. [R. 88]. Further, during Claimant's life, there was no diagnosis of heart problems or symptoms related thereto.

The Court finds that the restriction to light work expressed by the ALJ in the hypothetical posed to the vocational expert and upon which the disability determination is based, is supported by substantial evidence. Accordingly, the Court finds that the ALJ's hypothetical question to the vocational expert and his reliance upon the vocational expert's testimony in his decision were proper and in accordance with established legal standards.

**Conclusion**

The Court finds that the ALJ evaluated the record in accordance with the legal standards established by the Commissioner and the courts. The Court further finds there is substantial evidence in the record to support the ALJ's decision. Accordingly, the decision of the Commissioner finding Plaintiff not disabled is AFFIRMED

SO ORDERED this 24th day of June, 2010.

FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE